**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|   |   |
|---|---|
| SHIRE US, INC., | |
| *Plaintiff,* | Civil Action No. 17-7716 (JMV) (SCM) |
| v. | |
| ALLERGAN, INC., ALLERGAN SALES, LLC, and ALLERGAN USA, INC., | **OPINION** |
| *Defendants.* | |

**John Michael Vazquez, U.S.D.J.**

This matter concerns antitrust allegations in the Medicare Part D ("Part D") prescription drug market. D.E. 64. Plaintiff, Shire US, Inc. ("Shire"), alleges that Defendants are engaged in an "ongoing, overarching, and interconnected scheme" to systematically block Plaintiff from competing with Defendants in the Part D prescription drug market for treatment of dry eye disease in violation of Sections 1 and 2 of the Sherman Act and state law. D.E. 64 ¶¶ 1, 25. Defendants consist of Allergan, Inc.; Allergan Sales, LLC; and Allergan USA, Inc. (collectively "Defendants" or "Allergan"). The present matter comes before the Court on Defendants' motion to dismiss Plaintiff's First Amended Complaint ("FAC") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 14. The Court reviewed all submissions[1] and held oral argument on February 26, 2019. For the reasons that follow, Defendants' motion to dismiss is granted.

---

[1] Plaintiff's First Amended Complaint is referred to as "FAC," D.E. 64. Defendants' moving brief is referred to as "Def. Br.," D.E. 14-1. Plaintiff's brief in opposition is referred to as "Pl. Opp'n," D.E. 31. Defendants' reply is referred to as "Def. Reply," D.E. 32. Plaintiff's letter providing

## I. BACKGROUND[2]

Plaintiff Shire alleges that Allergan is coercing Part D prescription drug plans to effectively exclude Shire's superior dry eye disease ("DED") treatment drug from the market through a combination of anticompetitive bundling and exclusive dealing arrangements. FAC ¶ 1. DED occurs when the eye does not produce enough tears or when tears are not of the correct consistency. *Id.* ¶ 34. The disease is evidenced by inflammation and damage to the ocular surface, resulting in blurry or fluctuating vision and eye fatigue. *Id.* About one million Americans currently receive prescription drug treatment for DED. *Id.* ¶ 36.

The Parties and Their Products

Shire and Allergan are competitors in the pharmaceutical industry. *Id.* Shire is a New Jersey pharmaceutical company that develops, manufactures, markets, and distributes pharmaceutical products worldwide. *Id.* ¶ 26. Allergan is a Delaware pharmaceutical company that engages in research, development, manufacturing, sales, distribution, and marketing of specialty pharmaceutical products. *Id.* ¶ 30.

Both companies offer a prescription drug for the treatment of DED. Shire offers Xiidra® and Allergan offers Restasis®. *Id.* ¶ 1. Xiidra and Restasis are the only FDA-approved prescription drugs on the market for treatment of DED. *Id.* ¶ 38. There are no reasonably available

---

supplemental authority will be referred to as "Pl. Ltr.," D.E. 48. Defendants' response to Plaintiff's letter will be referred to as "Def. Resp.," D.E. 50.

[2] The facts are derived from Plaintiff's FAC. D.E. 64. When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

substitutes to treat DED. *Id.* ¶ 116. Over-the-counter treatments, such as artificial tears, are insufficient to treat the underlying inflammation that causes DED. *Id.*

The FDA approvals for Xiidra and Restasis are different in scope. *Id.* In July of 2016, the FDA approved Shire's Xiidra for treatment of both the symptoms and signs of DED. *Id.* ¶ 8. Clinical studies show that patients taking Xiidra experienced relief from DED symptoms of within as little as two weeks, and from underlying inflammatory conditions within six to twelve weeks. *Id.* ¶ 8. In contrast, the FDA has approved Restasis® only for treatment of a specific symptom of DED – reduced tear fluid volume – which affects only ten percent of those with DED. *Id.* ¶ 38. Restasis has been on the market for fifteen years, during which time patients have reported ocular burning from using the drug. *Id.* ¶¶ 1, 40. One study indicated that 23% of patients discontinued use of Restasis within three months of first using it and 43% of patients stopped use within six months. *Id.* ¶ 40. Clinical studies reflect that it typically takes longer than six months for Restasis to become effective. *Id.* ¶ 40.

Given Xiidra's potential advantages over Restasis, it has been referred to by industry officials as a "big game changer." *Id.* ¶ 47. In the two years following its launch in 2016, Xiidra captured approximately 35% of the commercial DED market, and around 10% of the Part D DED market. *Id.* ¶ 122. Restasis maintains approximately 90% of the Part D DED market. *Id.* ¶ 131.

The Part D DED Market

For purposes of its antitrust claims, Plaintiff identifies the Part D DED market as the relevant product market. *Id.* ¶ 115. Congress passed Medicare to provide affordable medical assistance to the elderly, and enacted Part D specifically as an optional outpatient prescription drug program for senior citizens to receive discounted and subsidized prescription drugs. *Id.* ¶¶ 50-53. Because DED is a condition that progresses with age, it disproportionally affects the elderly. *Id.*

¶ 37. Prescriptions for DED treatment under Part D account for approximately 40% of all DED prescriptions.

Participants in Part D can choose from a variety of plans. *Id.* ¶ 53. The list of drugs covered by a particular plan is called the plan's "formulary." *Id.* ¶ 54. Formularies offer drugs in a number of tiers that dictate the patient's copayment. *Id.* ¶ 61. Drugs with the lowest copayment are listed in the "preferred" tier, followed by the "non-preferred" tier. *Id.* ¶ 61. If a drug is not listed on a formulary, then it is considered "not covered" and the patient must either pay for the drug in full (at a price that is typically two to five times higher than that listed on the formulary) or have his or her physician file a successful appeal with the plan seeking an exception.[3] *Id.* Hence, drugs not covered on formularies are faced with a competitive disadvantage in the Part D marketplace. *Id.* ¶ 64.

Plaintiff alleges that commercial prescription drug plans are not substitutes for Part D because individuals covered by Part D (individuals aged 65 and older or with permanent disabilities) receive lower premiums for a comprehensive list of prescription drugs. Thus, Part D participants have no need for traditional, commercial prescription drug plans. *Id.* ¶ 117. In fact, Plaintiff alleges that it, Defendants, and other industry participants recognize Part D as its own independent market, often using different staff or hiring third parties to engage with Part D administrators. *Id.* ¶ 118. Plaintiff adds that the Part D administrators also treat the Part D DED market differently than any separate commercial business that they may engage in. *Id.* ¶ 120.

---

[3] For a successful appeal, a physician must establish (i) failure of the drug listed on the formulary to effectively treat the patient's condition, or (ii) the patient's inability to tolerate the side effects or other problems caused by the drug listed on the formulary. *Id.* ¶¶ 63-65.

<u>The Alleged Anticompetitive Conduct</u>

Plaintiff essentially alleges two forms of anticompetitive conduct by Defendants: anticompetitive bundling and exclusive dealing contracts. *Id.* ¶¶ 126-27. First, Plaintiff alleges that Defendants engaged in anticompetitive bundling by contracting with "Plan 1" and "Plan 2" to offer Restasis in a bundled portfolio of drugs at a price below its average variable cost. *Id.* ¶¶ 86, 91, 97. Second, Plaintiff alleges that Defendants engaged in an exclusive dealing contract with "Plan 3" whereby the plan is contractually barred from offering any other DED drug on its formulary for the foreseeable future. *Id.* ¶ 107.

A review of the seller-side of the Part D market is required to properly understand these claims. "Pharmaceutical companies negotiate annually with Part D plans to gain placement of their drugs on the plans' formularies for the coming year." *Id.* ¶ 68. The negotiations usually begin around April of "the preceding plan year and culminate in August of the same year when the plans finalize their formularies for the coming year." *Id.* Certain Part D plans delegate their negotiation and selection process to administrators. *Id.* ¶ 72. For example, "several of the top ten Part D plans and many smaller ones use another top ten plan (Plan 3) to negotiate and administer their formulary coverage." *Id.* As a result, Plan 3 negotiates with pharmaceutical companies on behalf of numerous Part D plans. *Id.* Similarly, "[p]harmaceutical companies typically contract with third party agents to oversee negotiations with plans for placement of their drugs on the plans' formularies," often to "keep[] [their] dealings with Part D plans separate from [their] dealings for commercial business." *Id.* ¶ 71.

During these annual negotiations, a pharmaceutical company seeks to secure its drugs' preferential placement on the Part D plan's formulary by minimizing the Part D plan's costs in offering the drugs. *Id.* ¶ 69. Although pharmaceutical companies do not sell their drugs directly

to Part D plans, Part D plans reimburse pharmacies for dispensing covered drugs to participants. *Id.* ¶ 60. Therefore, to lower the plan's reimbursement expenses, pharmaceutical companies offer rebates and discounts to patients who acquire a prescription drug through a particular Part D plan. *Id.* ¶¶ 69-70. Pharmaceutical companies also offer price protection, meaning that if the price for their drug increases during the contractual term, rebates will also proportionally increase, ensuring that the plans do not incur any additional costs. *Id.* ¶ 70.

The top three plans in Part D are Plan 1, Plan 2, and Plan 3.[4] About 70% of the Part D prescriptions for DED treatment are derived from the three plans. *Id.* ¶ 109. Despite Plaintiff's view that Xiidra is superior to Restasis, Plaintiff has been unable to secure a "preferred" position for Xiidra on any of the formularies of these plans. *Id.* ¶¶ 87-109. Plaintiff alleges that this is because Defendants have unlawfully engaged in (1) anticompetitive bundling with Plan 1 and Plan 2, and (2) improper exclusionary contracting with Plan 3.[5] *Id.* ¶¶ 86, 91, 97, 107.

Shire alleges that Allergan's technique of "bundling" rebates across its products, including Restasis, to secure exclusivity on top plans' formularies constitutes unlawful anticompetitive conduct. *Id.* ¶ 148. Allergan offers a number of products in its Part D portfolio aside from Restatsis. *Id.* ¶ 74. Among these other products are Lumigan®, Combigan®, and Alphagan P®. *Id.* The FDA approved Lumigan, Combigan, and Alphagan P for treatment of high eye pressure in patients with glaucoma or ocular tension. *Id.* ¶¶ 75-77. The FDA has not approved a generic

---

[4] As noted, Plan 3 actually refers to four separate top-ten plans that are negotiated jointly though one administrator. *Id.* ¶ 98. The FAC does not indicate whether Plan 1 and Plan 2 negotiate through an administrator or through their own representatives.

[5] Plaintiff does not attach the actual contracts between Allergan and these Part D plans but notes that "[a]greements of this nature are not available to the public and typically contain confidentiality provisions that prohibit their disclosure to anyone except the parties to the agreements." *Id.* ¶ 108. Therefore, Plaintiff drew on its own interactions with the Part D plans to form its factual allegations.

substitute for any of these three drugs in the United States. *Id.* For the four quarters spanning from the third quarter of 2016 to the second quarter of 2017, the three glaucoma drugs accounted for almost $750,000,000 of Allergan's sales in Part D plans. *Id.* ¶ 78. Restasis accounted for $719,000,000 of Allergan's sales in Part D plans during this same period. *Id.* Thus, Plaintiff alleges that Allergan has "more than enough financial wherewithal" to offer Restasis to Part D plans "at an effective price that is below Allergan's average variable cost" and potentially even "for free" given the commercially advantageous positioning of Allergan's other offerings. *Id.*

Regarding Plan 1, which is responsible for nearly 25% of the Part D DED market, Plaintiff offered "substantial rebates and discounts" in attempts to have Xiidra placed on the plan's formulary. *Id.* ¶ 89. In response, Plan 1 informed Plaintiff that any placement of Xiidra on its formulary would result in the loss of rebates from Allergan, stating that "[y]ou could give [Xiidra] to us for free, and the numbers still wouldn't work." *Id.* ¶ 89. Further, Plan 1 told Plaintiff that it would need Allergan's "permission" for Xiidra to be listed on the formulary. *Id.* ¶ 90. Plan 1 eventually listed Xiidra on its formulary but only in its "non-preferred" tier, resulting in copayments that are two to five times higher than if Xiidra was listed in the "preferred tier" with Restasis. *Id.* Plaintiff believes that if the plan's formulary included Xiidra in any capacity other than "non-preferred," Plan 1 would "lose the price protection, rebates, and discounts on the entirety of Allergan's Part D portfolio." *Id.* ¶ 91. Plaintiff alleges that '[t]his makes it impossible for Shire to offer discounts on Xiidra that compete with the bundled rebates provided by Allergan and keep Xiidra's price above its cost." *Id.*

Regarding Plan 2, which is responsible for over 11% of the Part D DED market, Plaintiff also offered "substantial rebates and discounts" to list Xiidra on its formulary. *Id.* ¶¶ 92-93. Plan 2 stated that listing Xiidra on its formulary would contractually cause Plan 2 to lose all of its "price

protection" and "bundled rebates" from Allergan. *Id.* ¶ 93. Plan 2 added that it would need to first "check with Allergan and get its permission[.]" *Id.* ¶ 94. Nevertheless, the Centers for Medicare & Medicaid Services ("CMS"), who contract with Part D administrators, *id.* ¶ 53, later informed Plan 2 that it would have to offer Xiidra given its formulary classifications. *Id.* ¶ 94. Plan 2, however, only placed Xiidra on its formulary as "non-preferred" with prior authorization and "step through" requirements. This means that Plan 2 patients must first try Restasis and experience "failure" before Plan 2 will contribute towards their prescriptions for Xiidra. *Id.* ¶ 94. Additionally, the copay for Xiidra is still two to five times higher than if it was listed in the "preferred" tier. *Id.* ¶ 95. Plaintiff alleges that "[t]his makes it impossible for Shire to offer discounts on Xiidra that compete with the bundled rebates provided by Allergan and keep Xiidra's price above its cost." *Id.* ¶ 97.

Plaintiff alleges that Defendants had an exclusionary agreement with Plan 3. *Id.* ¶ 107. Plan 3 is responsible for 34% of the Part D DED market. *Id.* ¶ 98. Plaintiff alleges that it met the pricing requirements that Plan 3 had indicated would secure Xiidra's listing on Plan 3's formulary. *Id.* ¶ 100. Plan 3 confirmed that the offered pricing would "get it done" and that Plaintiff need not improve its offer. *Id.* ¶ 100. Plan 3 later retracted these statements, explaining that Xiidra could not be added to the formulary because it would create "too much disruption" as Allergan's contract with Plan 3 prohibited offering another DED treatment on the formulary. *Id.* ¶¶ 101-102. A "Shire executive" then asked Plan 3 how it could "get out" of this position in the future, to which Plan 3 responded, "you don't."[6] *Id.* ¶ 102. Therefore, Xiidra is "not covered" by Plan 3's formulary, requiring Plan 3 patients to pay two to five times more for Xiidra than if Xiidra was

---

[6] Plaintiff does not identify who (by position) from Plan 3 made these statements. Similarly, Plaintiff does not indicate the position of the "Shire executive."

listed as a "preferred" drug on the formulary like Restatsis. *Id.* ¶ 104. Plaintiff alleges that Defendants' agreement with Plan 3 prohibits the plan from contracting with Defendants' competitors (such as Plaintiff) beyond the one-year term, regardless of the offer that the competitor may make. *Id.* ¶ 107.

Plaintiff also relies on a public statement by Allergan's CEO in mid-2017, stating that Allergan has "blocked" Plaintiff from the Part D DED market. *Id.* ¶ 14. Plaintiff continues that the financial terms (including discounts, rebates, and price protection) that Plaintiff offered the three Part D plans "far exceeded" the discount rates on Xiidra that Plaintiff successfully offered to commercial prescription drug plans. *Id.* ¶ 106. Thus, Plaintiff alleges that Allergan is engaged in an "overarching and interconnected scheme of anticompetitive tactics, which have successfully blocked Shire's access to the Part D market[.]" *Id.* ¶ 108.

Plaintiff alleges that Allergan's conduct will effectively deny or severely limit Part D beneficiaries' access to Xiidra, the only drug approved for the treatment of both the signs and symptoms of DED. *Id.* ¶ 136. Plaintiff asserts that Defendants' conduct forces Part D patients (i) to make higher copayments for Xiidra; (ii) to accept less value for their copayment because Restasis is inferior to Xiidra; and (iii) to incur higher costs for DED treatment by purchasing a topical steroid used in conjunction with Restasis treatment, which is unnecessary when using Xiidra. *Id.* ¶ 137. Plaintiff continues that it "will continue to lose millions of dollars in sales and profits from within the [Part D DED market]" as a result of Defendants' actions. *Id.* ¶ 151.

## II. PROCEDURAL HISTORY

Plaintiff filed its Complaint on October 2, 2017, alleging seven causes of action: (I) monopolization under the Sherman Act, 15 U.S.C. § 2; (II) attempted monopolization under the Sherman Act, 15 U.S.C. § 2; (III) agreements in restraint of trade under the Sherman Act, 15 U.S.C.

§ 1; (IV) monopolization under the New Jersey Antitrust Act, N.J.S. § 56:9-4; (V) attempted monopolization under the New Jersey Antitrust Act, N.J.S. § 56:9-4; (VI) agreements in restraint of trade under the New Jersey Antitrust Act, N.J.S. § 56:9-3; and (VII) tortious interference with business relationships. Compl. ¶ 25. Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 5, 2017. D.E. 14. Plaintiff filed opposition, D.E. 31, to which Defendants replied, D.E. 32. Plaintiff filed a letter of supplemental authority, D.E. 48, and Defendants responded, D.E. 50.

On September 28, 2018, Plaintiff sought leave to amend its Complaint for the sole purpose of including money damages in the relief sought. D.E. 55. Because the proposed amendment did not alter any of the substantive allegations set forth in the original Complaint, the parties agreed that Defendants' pending motion to dismiss would apply to the FAC. *See* D.E. 58. On February 26, 2019, the Court held oral argument on the motion. D.E. 70.

## III.  STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal

quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

## IV. ANALYSIS

Defendants argue that Plaintiff fails to plausibly plead a relevant product market and fails to sufficiently allege anticompetitive conduct. Def. Br. at 2-5, 13-39. Because the antitrust claims fail, Defendants continue, so must the tortious interference claim. *Id.* at 39-40. Plaintiff responds that it has plausibly alleged the relevant market and anticompetitive conduct. Pl. Opp'n at 14-38. It adds that tortious interference can exist separate and apart from the alleged anticompetitive conduct. *Id.* at 38-40.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A Section 1 claim consists of two elements: (1) "the plaintiff must show that the defendant was a party to a contract, combination . . . or conspiracy," and (2) "the plaintiff must show that the conspiracy . . . imposed an unreasonable

restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (internal quotations omitted).

Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Monopolization is demonstrated through "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062 (3d Cir. 1978) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). For attempted monopolization, a plaintiff must show that a defendant "(1) had specific intent to monopolize the relevant market, (2) engaged in anti-competitive or exclusionary conduct, and (3) possessed sufficient market power to come dangerously close to success." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992); *see also Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir.), *cert. denied sub nom. Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 139 S. Ct. 211 (2018).

Further, "the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016) (quoting *State v. N.J. Trade Waste Ass'n*, 96 N.J. 8, 19 (1984)). Both parties agree on this point. Def. Br. at 12 n.6; Pl. Opp'n at 12-37. Therefore, the Court analyzes the antitrust claims pursuant to federal law.

Relevant Product Market

In an antitrust matter, two markets must be defined: the relevant product market and the relevant geographic market. *See LePage's Inc. v. 3M*, 324 F.3d 141, 146 (3d Cir. 2003) (analyzing

a Section 2 claim); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722-27 (3d Cir. 1991) (analyzing a Section 1 claim). Defendants contend that Plaintiff's relevant product market – the Medicare Part D DED market – is implausibly narrow. Def. Br. at 14. In support, Defendants argue that because Plaintiff is alleging *supplier* exclusion, the relevant product market must be defined from the *supplier's* perspective. *Id.* at 15. Defendants argue, as a result, that the relevant product market must include the commercial prescription insurance market. *Id.* at 22-23. Defendants also note that there is no allegation that Part D DED sales are essential to Shire's survival. *Id.* at 24.

Plaintiff responds that the injury is both to Shire and Part D DED patients, therefore the relevant product market should also take into account the consumer's perspective. Pl. Opp'n at 14-15. Plaintiff also notes that from the supplier's perspective, suppliers treat the Part D market independently from the commercial market, and practical indicia also demonstrate that the Part D market is distinct from the commercial market. *Id.* at 15-20.

The Third Circuit has not yet ruled on this issue, that is, the appropriate relevant product market when a supplier alleges that it has been improperly excluded. Although the matter is not free from doubt, the Court finds that under the circumstances alleged (that is, a supplier allegedly excluded from a market), the relevant product market consists of those to whom the supplier can sell unless special circumstances exist. As a result, Plaintiff's proposed relevant market – Medicare Part D – is not plausibly pled because it is too narrow. The proposed market fails to account for others, such as non-government payers, to whom Plaintiff can sell its product.

Before turning to the analysis of the relevant product market, the Court notes the overarching aim of antitrust law that permeates all aspects of the legal analysis: "[t]he purpose of the Sherman Act 'is not to protect businesses from the working of the market; it is to protect the

public from the failure of the market.'" *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 518 (3d Cir. 1998) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997)). Antitrust laws protect competition, not competitors, and can relegate an entire class of competitors to "oblivion" unless consumers are also hurt by the lack of competition. *Id.* (citing *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 494 (3d Cir. 1992)).

Plaintiff points to *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), in support of its position. *Brown Shoe* concerned a proposed merger between two large manufacturers and retail sellers of shoes. *Id.* at 296-97. The government challenged the merger under Section 7 of the Clayton Act, which addresses mergers that substantially lessen competition or tend to create a monopoly. *Id.* The Supreme Court discussed the analysis necessary in defining a relevant product market. *Id.* at 325-28. The majority explained that the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325. However, the Court in *Brown Shoe* noted that within a broad market, well-defined submarkets can also exist. *Id.* The Court stated that the boundaries of these submarkets depend on "practical indicia" such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors[.]" *Id.* Applying these factors, the Supreme Court upheld the district court's finding that the distinct product markets in *Brown Shoe* were men's, women's, and children's shoes. *Id.* at 326.

In *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 8 (D.D.C. 2017), another case on which Plaintiff relies, the district court was again faced with a government challenge pursuant to Section

7 of the Clayton Act as to a proposed merger between Aetna and Humana. Aetna and Humana were two of the largest health insurance companies in the country. *Id.* One issue that the court confronted was whether the relevant product market consisted of general Medicare or of the narrower Medicare Advantage. *Id.* at 11-16. Medicare is a baseline federal government health insurance program for seniors, while Medicare Advantage plans are private insurance programs offered to Medicare-eligible seniors that typically include a broader scope of coverage than that of traditional Medicare. *Id.* at 11-13.[7] Using the *Brown Shoe* factors, the *Aetna* court concluded that the relevant product market was the narrower Medicare Advantage. *Id.* at 29. The judge in *Aetna* recognized that the healthcare industry and related publications identified Medicare and Medicare Advantage as distinct markets. *Id.* at 24. Further, according to the trial judge, both Aetna and Humana reported Medicare Advantage results separately in their annual financial reports. *Id.* The court in *Aetna* continued that both companies divided employees into Medicare Advantage-specific groups, used separate IT platforms for Medicare Advantage, and set pricing on a different track for Medicare Advantage. *Id.* The *Aetna* court recognized that "[e]vidence abounds of intense, local competition between Medicare Advantage plans" and therefore "the evidence tends to establish the existence of a market for the sale of individual Medicare Advantage plans."[8] *Id.* at 29.

---

[7] The *Aetna* court also had to determine whether the public exchanges under the Affordable Care Act could comprise a separate relevant market.

[8] The *Aetna* decision followed trial so that the district court had information not be available at the motion to dismiss state. For example, the court in *Aetna* considered econometric evidence indicating that a merger would substantially dampen competition in the Medicare Advantage market and evidence demonstrating how head-to-head competition in the Medicare Advantage market benefited consumers by lowing premiums and copays. *Id.* at 33-45.

As noted, the Third Circuit has not expressly addressed the issue before the Court. Yet, in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998), the Circuit engaged in a pertinent analysis as to determining a relevant product market. In *Brokerage Concepts*, "Gary's"[9] consisted of a small chain of pharmacies in Pennsylvania. *Id.* at 501. Defendant U.S. Healthcare, Inc., had a health maintenance organization ("HMO") as well as third-party administrator ("TPA") business, both run through its subsidiaries. *Id.* at 501, 504. A TPA is an organization that provides important services for employers who wish to self-insure for their health benefit insurance needs. *Id.* at 504. An HMO is a network of healthcare providers (including doctors, hospitals, and pharmacies) in a geographic region that individuals can subscribe to in order to get reduced copayments for healthcare services within the network. *Id.* at 505. Under the defendant's HMO prescription purchase program, the HMO's subscribers selected one pharmacy from a network of providers; the subscribers could thereafter purchase their medications from the selected pharmacy for a small co-pay. *Id.* For participating pharmacies, the defendant's HMO paid "a set monthly amount based on the number of U.S. Healthcare subscribers designating that pharmacy[,]" and pharmacies wanted to be in the HMO network for financial reasons. *Id.*

In 1991, all of Gary's stores were approved providers in the defendant's HMO pharmacy network. *Id.* That same year, Gary's decided to self-insure for its own employees' health benefits and was, therefore, in need of a TPA. *Id.* Instead of selecting the defendant's TPA, however, Gary's chose the plaintiff. *Id.* As a result, the defendant retaliated against Gary's in the HMO arena by conducting on-site audits, placing one store on a freeze for three months, and not

---

[9] "Gary's" full name was Eagleville Pharmacy, Incorporated d/b/a I Got It at Gary's. *Brokerage Concepts, Inc.*, 140 F.3d at 501, 505.

processing an application for a new store. *Id.* at 505-506. Not surprisingly, Gary's switched to the defendant's TPA. *Id.* The plaintiff sued the defendant for, among other things, a violation of Section 1 of the Sherman Act. *Id.* at 507-08. The plaintiff's theory of liability was that the defendant improperly used its market power in the HMO area to force Gary to switch to the defendant's TPA. *Id.* at 508, 510.[10]

To evaluate plaintiff's Section 1 claim, Chief Judge Becker explained that the court first had to define the relevant product and geographic markets. *Id.* at 513. As to the product market, the court in *Brokerage Concepts* indicated that "[t]he outer boundaries of a product market are determined by evaluating which products would be reasonably interchangeable by consumers for the same purpose." *Id.* (citations omitted). "Interchangeability implies that one product is roughly equivalent to another[,]" the Circuit observed, and "while there might be some degree of preference for the one over the other, either would work effectively." *Id.* (internal quotations and citations omitted). Chief Judge Becker continued that a measure of interchangeability is "cross elasticity of demand between the product itself and substitutes for it." *Id.* at 513-14 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997), which was quoting *Brown Shoe*, 370 U.S. at 325). "When there is cross-elasticity of demand between products in a market, 'the rise in the price of a good within [the] relevant market would tend to create a greater demand for other like goods in that market.'" *Id.* at 514 (quoting *Tunis Bros.*, 952 F.2d at 722).

The plaintiff argued that the relevant product market was a "single brand market[,]" meaning only members of the defendant's HMO with prescription drug benefits. *Id.* The Circuit rejected the plaintiff's proposed market as too narrow. *Id.* Chief Judge Becker reasoned that the

---

[10] The plaintiff characterized the defendant's actions as a form of unlawful tying. *Id.* at 508, 510. Ultimately, the Third Circuit disagreed and found that the alleged conduct fell somewhere between a tying arrangement and reciprocal dealing. *Id.* at 511.

defendant HMO's members are interchangeable with members from other HMOs as well as uninsured persons who purchase prescription drugs. *Id.* The court in *Brokerage Concepts* found that the fact that pharmacies remained in the defendant's HMO network even when defendant lowered reimbursement amounts did not demonstrate a lack of cross-elasticity of demand. Critically, Chief Judge Becker indicated that the plaintiff's claim had to be analyzed from Gary's perspective and not from the viewpoint of the members of the defendant's HMO. *Id.* at 515; *see also id.* at 514 ("Thus the issue is which products, if any, Gary's, the consumer, would find to be reasonably interchangeable with, or substitutable for, [the defendant's] members who purchase prescription drugs."). As noted, the Circuit concluded that from Gary's perspective, the defendant's HMO members were interchangeable with uninsured persons who buy prescription drugs and other HMOs' members. *Id.* at 514-15.

Although the Third Circuit has not ruled on the pending issue, the Eighth Circuit has. In *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 594 (8th Cir. 2009), the plaintiff started its own hospital and alleged that defendant, the largest hospital company in the state, used its superior market power to force a large health insurance company to terminate its relationship with the plaintiff. The plaintiff sued for violations of Section 1 and Section 2 of the Sherman Act. *Id.* at 595.

The plaintiff defined the relevant product market as patients covered by private insurance, thereby excluding uninsured patients and patients covered by government insurance programs. *Id.* at 596-97. Relying in part on *Brokerage Concepts*, the Eighth Circuit rejected the plaintiff's proposed product market as unduly narrow. *Id.* The *Little Rock* court reasoned as follows:

> [The plaintiff] argues that the product market should be limited to patients using private insurance because private insurance and government insurance—the other primary method of payment—are not reasonably interchangeable. *The trouble with this theory is that*

> *it analyzes the issue from the wrong side of the transaction. It may be true that, from the patient's perspective, private insurance and Medicare/Medicaid are not reasonably interchangeable.* For a variety of reasons, including age and financial considerations, a person with private insurance may not qualify for these government programs. *But this lawsuit is not about the options available to patients, it is about the options available to shut-out cardiologists.*

*Id.* at 597 (emphases added). The *Little Rock* court continued that the plaintiff's claims "boil down to the allegation that, due to [the defendant]'s allegedly unlawful actions, [the plaintiff] has access to fewer patients," therefore, "[t]he relevant question, then, is to whom might the cardiologists at [the plaintiff's hospital] potentially provide medical service?" *Id.* The Eight Circuit recognized that the plaintiff can provide service to patients "from either a government program such as Medicare or Medicaid, *or* from a private insurer." *Id.* (emphasis in original). Thus, the court concluded, "[p]atients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable *from the cardiologist's perspective*—the correct perspective from which to analyze the issue in this case." *Id.* (emphasis added). The court in *Little Rock* emphasized that the key inquiry in shut-out supplier cases is to whom can the *supplier* sell its product. *Id.*[11]

The First Circuit has reached the same conclusion. *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir 2004) (explaining that "the concern in

---

[11] The Third Circuit in *Federal Trade Commission v. Penn State Hershey Medical Center*, 838 F.3d 327, 339-41 (3d Cir. 2016), disagreed with the *Little Rock* court's analysis as to relevant geographic market. The Circuit explained that in determining the relevant geographic market, the *Little Rock* court (although not expressly), used the "Elzinga–Hogarty test," which "first, [looks to] the number of customers who come from outside the proposed market to purchase goods and services from inside of it, and, second, [looks to] the number of customers who reside inside the market but leave that market to purchase goods and services." *Id.* at 339-40. The Circuit recognized that this test is "utilized in non-healthcare markets to define the relevant geographic market" and even "was once the preferred method to analyze the relevant geographic market," but "subsequent empirical research demonstrated that [it] resulted in overbroad markets with respect to hospitals." *Id.* Thus, the Circuit found this test to be "inconsistent" with the hypothetical monopolist test, its preferred test for determining the relevant geographic market. *Id.* at 339.

an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*" and "for Walgreens and Stop & Shop, their potential customers are presumptively *all* retail customers for prescription drugs—not just that smaller sub-group who are insured or reimbursed." (emphasis in original)).

Certain courts have recognized that suppliers may nevertheless establish a special sub-group of buyers if the supplier shows that special circumstances exist. *See*, *e.g.*, *Stop & Shop*, 373 F.3d at 67 ("Conceivably . . . there might be some special circumstance that ma[kes] separate consideration of [a] sub-group appropriate[] [b]ut . . . there is no hint in this case."). As to health care insurance markets, at least one district court has indicated that special circumstances are met when a supplier can show that if it is shut out of a particular sub-market, the supplier's long-term viability is jeopardized. *See Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-01054, 2015 WL 1399229 (C.D. Ill. Mar. 25, 2015). In *Methodist Health*, the plaintiff sued the defendant under Section 1 and Section 2 of the Sherman Act. *Id.* at *1. The parties were competing hospitals, but only the defendant provided certain essential medical services, such as tertiary pediatric services, Level 3 neonatal intensive care, and Level 1 trauma care. *Id.* The plaintiff alleged that the defendant used these exclusive services as leverage over commercial health insurers, claiming that the defendant threatened to withdraw from these commercial insurers' networks if the insurers included the plaintiff in their networks. *Id.* at *2. The plaintiff asserted that they needed the business of these commercial insurers to supplement the comparatively low payments from government insurers. *Id.* at *3.

The *Methodist Health* court, at the motion to dismiss stage, permitted the complaint to go forward although the plaintiff defined the relevant product market only as commercial payers, excluding government payers. *Id.* at *7. The district judge found that the plaintiff had adequately

pled special circumstances; that is, the plaintiff alleged (and the defendant admitted) "that access to privately-insured patients is critical to a healthcare provider's long-term sustainability in light of the comparatively low prices providers are required to charge patients covered by government plans for the same services—prices that, in certain cases, may be below cost." *Id.* (internal citations omitted). Later, at the summary judgment stage, the *Methodist Health* court found for the defendant. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-1054, 2016 WL 5817176, at *9 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017). Nevertheless, the court again reiterated that commercial and government payers are "not interchangeable from the perspective of a hospital" as "government payers pay significantly less than commercial payers" so much so that "payments from government insurers do not cover the providers' costs." *Id.* In other words, the *Methodist Health* court permitted the relevant product market to consist solely of commercial insurers due to special circumstances, that is, if the plaintiff relied solely on government insurance, the plaintiff may have gone out of business.

Turning to the matter at hand, the Court finds that when a supplier who is allegedly shut out of a market (or a substantial portion of the market), the relevant product market consists of all persons or entities to whom that supplier can reasonably sell unless special circumstances exist. As a result, Plaintiff's product market of Medicare Part D is unduly narrow because it excludes others, notably commercial payers, to whom Plaintiff can sell Xiidra. Plaintiff also has not plausibly alleged special circumstances here. The Court therefore grants Defendants' motion to dismiss on this ground. This ruling follows the Eighth Circuit's decision in *Little Rock* and the First Circuit's ruling in *Stop & Shop*. However, the ruling also finds support in the Third Circuit's *Brokerage Concepts* decision. There, the Circuit did not limit the relevant market to potential pharmacy customers from the defendant's HMO as the plaintiff had advocated. The Third Circuit

found that the defendant's HMO members who purchase prescription drugs were interchangeable with members of other prescription plans and uninsured persons because the proper perspective was that of Gary's, the pharmacy chain in question.

In other words, perspective is critical. In this case, the proper perspective is from the supplier's vantage point rather than the customer's view. For example, citing *Brown Shoe* and *Aetna*, Plaintiff places great emphasis on the fact it "separate[s]" its sales between commercial payers and government payers, *e.g.,* FAC ¶ 118, and it does plausibly plead this fact. In addition, the Court would be very surprised if Defendants did not do same. Putting aside price differentials, commercial and government health insurance entails different regulatory schemes. *Id.* ¶¶ 119-120. However, and critically, both *Brown Shoe* and *Aetna* dealt with potential mergers that were going to harm competition vis-a-vis consumers – not suppliers.[12] The same has not been alleged here, and the Court finds that Plaintiff's relevant product market is not plausibly pled.

Anticompetitive Conduct

As noted, Plaintiff alleges two forms of anticompetitive conduct: Defendants' bundling agreements with Plans 1 and 2, as well as an exclusive dealing agreement with Plan 3. FAC ¶¶ 91, 97, 107. Defendants claim that their conduct is "nothing more than lawful competition on the merits," because (1) Defendants do not have monopoly power over their bundled glaucoma drugs; (2) Defendants' agreements with the plans are only for one-year; and (3) Defendants' combined pricing is not below the collective costs of the relevant drugs. Def. Br. at 25-39. Plaintiff responds that (1) Defendants have monopoly power over Restasis in the Part D market and do not need to

---

[12] Thus, if the Court was confronted with a proposed merger of Plaintiff and Defendants, then the relevant product market might very well be Medicare Part D because the Court would be viewing the issue from the consumer's perspective. The consumer's perspective was the relevant viewpoint in both *Brown Shoe* and *Aetna*.

have monopoly power over any of the non-competing glaucoma drugs; (2) Plaintiff lacks comparable glaucoma drugs to compete with Defendants' Part D bundle; and (3) Defendants' one-year contracts can still be anticompetitive. Pl. Opp'n at 24-35.

The Third Circuit has reviewed numerous cases involving bundling agreements and exclusive dealing arrangements. *E.g., Eisai Inc. v. Sanofi Aventis U.S. LLC*, 821 F.3d 394 (3d Cir 2016); *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir 2012); *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir 2003) (*en banc*); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir 1978). *SmithKline* concerned cephalosporins, a class of antibiotics. *SmithKline*, 575 F.2d at 1059. Due to its patents, the defendant enjoyed a monopoly in the cephalosporin market for years. *Id.* In 1973, the plaintiff began selling Ancef, a cephalosporin that competed directly with the defendant's Kefzol. *Id.* In response, the defendant devised a revised marketing program so that if a purchaser bought three of the defendant's cephalosporins, the buyer received a 3% discount. *Id.* at 1059-60. The defendant's bundle included two cephalosporins, Keflin and Keflex, for which the defendant faced no market competition. *Id.* at 1060-61. As a result, the plaintiff had to offer a 16% to 35% discount on its one product, Ancef, to be able to compete with the defendant's bundled rebate. *Id.* at 1062. Even with the plaintiff's competition, the defendant's market share had only been reduced to 88.6% by 1975. *Id.* at 1060.

The plaintiff sued the defendant for a violation of Section 2 of the Sherman Act. *Id.* at 1062. The Third Circuit determined that the defendant's rebate programs insulated Kefzol from true price competition with Ancef. *Id.* at 1065. The *SmithKline* court found that "the act of willful acquisition and maintenance of monopoly power was brought about by linking products on which [the defendant] faced no competition [Keflin and Keflex] with a competitive product, Kefzol." *Id.* The Circuit continued that "[t]he result was to sell all three products on a non-competitive basis in

what would have otherwise been a competitive market for Ancef and Kefzol" and that "[t]he effect of the [revised marketing program] was to force [the plaintiff] to pay rebates on one product, Ancef, equal to rebates paid by [the defendant] based on volume sales of three products." *Id.* Thus, the court in *SmithKline* concluded that the defendant's revised marketing plan "associate[d] [the defendant]'s legal monopolistic practices with an illegal activity that directly affected the price, supply, and demand of Kefzol and Ancef," thereby violating Section 2 of the Sherman Act. *Id.*

In *LePage's*, the defendant manufactured Scotch tape and controlled over 90% of the transparent tape market. 324 F.3d at 141. The plaintiff entered the private label transparent tape market, meaning that it manufactured transparent tape sold under a retailer's name rather than under the plaintiff's name. *Id.* By 1992, the plaintiff's product accounted for 88% of the private label transparent tape market. *Id.* The defendant then decided to enter the same market. *Id.* The defendant instituted two programs, both consisting of bundled rebates, with major retailers. *Id.* at 144-45. The products in the bundled rebates consisted of goods from over six of the defendant's product lines. *Id.* at 154. The rebates were considerable and, importantly, if a retail customer failed to meet the target in any single product line, then it lost the entire rebate. *Id.* The plaintiff sued the defendant for violation of Section 2 of the Sherman Act. *Id.* at 145.

In evaluating the plaintiff's antitrust claims, the Third Circuit in *LePage's* discussed its earlier opinion in *SmithKline*, where it recognized that the gravamen of the defendant's Section 2 violation was that the defendant "linked a product on which it faced competition *with products on which it faced no competition*." *Id.* at 156 (emphasis added) (citing *SmithKline*, 575 F.2d at 1065). Similarly, the Circuit recognized that in *LePage's*, the defendant's bundled rebates exploited its monopoly power over Scotch tape, as Scotch tape was indispensable to any retailer in the

transparent tape market. *Id.* The court determined that the defendant thus "used its monopoly in transparent tape, backed by its considerable catalog of products, to squeeze out" the plaintiff from the private label transparent tape market. *Id.* The Circuit also concluded that the defendant's rebate programs were designed to have major retailers deal exclusively with the defendant, as the defendant set targets to force a retailer to either drop any non-Scotch products or lose the maximum rebate. *Id.* at 159. The Circuit accordingly found the defendant in violation of Section 2. *Id.*

More recently, in *ZF Meritor*, the relevant market was heavy duty ("HD") truck transmissions in North America. 696 F.3d at 263. There were only four direct purchasers, referred to as the Original Equipment Manufactures ("OEMs"), of HD transmissions in North America. *Id.* at 264. Truck buyers, the ultimate consumers of HD transmissions, could select the transmission and other components of their trucks from OEM catalogues called "data books." *Id.* Data books listed component choices as "standard" or "preferred/preferentially-priced," with the latter being the lowest priced component in the data book among comparable products. *Id.* Data book placement was essential for success in the HD transmissions industry. *Id.*

The defendant was a monopolist in the market for HD transmissions in North America since the 1950s. *Id.* The plaintiff entered the market in 1989, and then joined a joint venture in 1999 to develop another competing transmission. *Id.* In response, the defendant entered into long-term agreements ("LTAs") with each OEM for at least a five-year duration that included a conditional rebate program. *Id.* at 265. Under the conditional rebate programs, OEMs could only receive rebates if they purchased a specified percentage of their requirements from the defendant (a "market share penetration target"), generally anywhere from 87% to 97.5% of the OEMs' requirements. *Id.* The LTAs also required the OEMs to publish the defendant's product as the standard offering in their data books. *Id.* Moreover, two of the LTAs required OEMs to remove

competitors' products from their data books completely. *Id.* Finally, the LTAs required the OEMs to "preferentially price" the defendant's transmissions against its competitors' products, which was sometimes achieved by OEMs raising the price of a competitor's product. *Id.* at 266.

After the defendant entered into the LTAs with the OEMs, the defendant imposed additional price penalties on customers who selected the plaintiff's product and urged OEMs to "force feed" the defendant's product to customers. *Id.* at 267. Although the defendant's prices were generally lower than the plaintiff's prices, the defendant's prices were never below its costs. *Id.* at 268. Due to the defendant's actions, the plaintiff's market share dropped to 8% by 2003 and then to 4% by 2005; ultimately the plaintiff went out of business in 2007. *Id.* The plaintiff sued the defendant pursuant to Section 1 and Section 2 of the Sherman Act as well as Section 3 of the Clayton Act. *Id.*

The *ZF Meritor* court defined an exclusive dealing contract as an "an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *Id.* at 270. The Third Circuit recognized that such agreements can be procompetitive, as they assure supply, price stability, outlets, investments, and planning. *Id.* Yet, the court in *ZF Meritor* also indicated that exclusive dealing arrangements can be anticompetitive, especially when "one supplier of goods or services unreasonably . . . deprive[s] other suppliers of a market for their goods." *Id.* Anticompetive effects, the Circuit observed, is of "special concern when [the restraints are] imposed by a monopolist." *Id.* at 271.

The *ZF Meritor* court ruled that "[d]ue to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason [test]." *Id.* Under the rule of reason test, the Third Circuit determined that "[t]he legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the

relevant market so as to adversely affect competition." *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)). The Circuit explained that "[i]n other words, an exclusive dealing arrangement is unlawful only if the 'probable effect' of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals." *Id.* (citing *Tampa Elec. Co.*, 365 U.S. at 329). The *ZF Meritor* court indicated that the following factors are relevant in conducting the analysis: relative market power, substantial market foreclosure, contract duration, actual anticompetitive effects versus procompetitive effects, coercive behavior, and a customer's ability to terminate agreements. *Id.* at 271-72.[13] The circuit noted that the presence of exclusive dealing is a threshold requirement. *Id.* at 282.

In applying the facts to this framework, the *ZF Meritor* court first explained that the plaintiff established exclusive dealing. *Id.* at 282-84. Although the LTAs did not expressly require exclusive dealing, the Circuit recognized that the LTAs' market penetration targets served, in effect, as mandatory purchase requirements. *Id.* at 282. The Third Circuit likened these agreements to the bundled rebates in *LePage's*, where no express exclusivity requirement existed, but the agreements were designed to, and did, operate as exclusive dealing agreements nonetheless. *Id.* (citing *LePage's*, 324 F.3d at 157-58). Additionally, the court in *ZF Meritor* recognized that exclusive dealing agreements typically cover 100% of the buyer's needs but that "partial" exclusive dealing can still be unlawful. *Id.* at 283. The *ZF Meritor* panel continued the LTAs, as

---

[13] The Circuit also discussed the price-cost test for predatory pricing, that is, "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Id.* at 272 (quoting *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 117 (1986)). The court in *ZF Meritor* noted that "[t]he Supreme Court has expressed deep skepticism of predatory pricing claims." *Id.* Ultimately, the Circuit determined that the price-cost test was not the appropriate standard to apply because the plaintiff did not allege "that the price itself functioned as the exclusionary tool," and instead turned to a rule of reason analysis. *Id.* at 281. Here, Plaintiff has not plausibly pled predatory pricing, so the Court foregoes a price-cost analysis.

partial exclusive dealing contracts, could be unlawful because there were only four OEMs, the defendant was a long dominant supplier, and the defendant entered into long-term agreements with each OEM covering 90% of the customer base. *Id.* The Circuit concluded that the plaintiff had met the threshold requirement by pleading partial, *de facto* exclusive dealing arrangements. *Id.* at 284.

The *ZF Meritor* court then turned to market conditions, recognizing that "[e]xclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *Id.* (citing *Tampa Elec. Co.*, 365 U.S. at 329). The Circuit recognized that HD transmissions are expensive to produce, must be modified by geographic region, and "must pass through the highly concentrated intermediate market in which the OEMs operate." *Id.* at 285. The court noted that other than the plaintiff, "no significant external supplier ha[d] entered the market for the [preceding] twenty years," as the market had "long been dominated" by the defendant. *Id.* at 284. Thus, the court in *ZF Meritor* found that the defendant had "leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs" even though "many of the terms of the LTAs were unfavorable to the OEMs and their customers." *Id.* at 285. The Circuit recognized that "a monopolist may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice," and that the case before it "involve[d] precisely the combination of factors" that resulted in "the rare case in which exclusive dealing would pose a threat to competition." *Id.*

The court in *ZF Meritor* then examined the extent of market foreclosure, the length of the LTAs, and anticompetitive provisions in the agreements. *Id.* at 286-87. The Circuit recognized that the defendant foreclosed a significant portion of the market, as the defendant entered into a

LTA with each of the four OEMs and essentially required them to purchase 80% to 97.5% of their requirements from the defendant. *Id.* at 286. The impact, the court noted, was that the plaintiff's overall market share dropped, from 8-14% in 2003, to 4% in 2005. *Id.* The *ZF Meritor* court also observed that the LTAs were not short-term agreements. *Id.* at 287. The Circuit noted that courts have found agreements for under a year to be presumptively lawful and agreements for one to two years to be lawful under certain circumstances. *Id.* at 286-87. Although long-term exclusive dealing contracts are not *per se* unlawful, the *ZF Meritor* court found that the defendant's five-year exclusive dealing contracts with all four OEMs to secure over 85% of the market were "unprecedented." *Id.* Finally, the Circuit recognized that "the LTAs were replete with provisions that a reasonable jury could find anticompetitive," recognizing that defendant's provisions barring certain competitors' products from being listed in the OEMs' data books as a "disaster" for the competitors. *Id.* at 287. The *ZF Meritor* court concluded that "there was more than sufficient evidence for a jury to conclude that the cumulative effect of [the defendant]'s conduct was to adversely affect competition." *Id.* at 289.

In *Eisai*, the defendant sold Lovenox, an injectable anticoagulant drug, since 1993. *Eisai*, 821 F.3d at 399. In 2005, the plaintiff purchased a license to sell Fragmin, a competing injectable anticoagulant drug. *Id.* The relevant product market consisted of two other injectable anticoagulant drugs available in the United States from 2005 to 2010. *Id.* Lovenox had the largest market share at 81.5% to 92.3%, and Fragmin had the second largest at 4.3% to 8.2%. *Id.* United States hospitals used group purchasing organizations ("GPOs") to negotiate their drug contracts. *Id.* at 400. The defendant offered the GPOs a program where hospitals received price discounts based on the volume of Lovenox purchased in comparison to other competing drugs. *Id.* If purchases of Lovenox were under 75% of total anticoagulant purchases, hospitals only received a

flat 1% discount. *Id.* Yet, as the percentage of Lovenox increased, hospitals received discounts ranging from 9% to 30%. *Id.* The program also included a formulary access clause that limited a hospital's ability to give competing drugs priority status on its formularies. *Id.*

The plaintiff sued the defendant for violations of Section 1 and Section 2 of the Sherman Act, Section 3 of the Clayton Act, and sections of the New Jersey Antitrust Act. *Id.* at 401. The district court granted summary judgment for the defendant. *Id.* On appeal, the *Eisai* court again recognized that exclusive dealing contracts can have procompetitive benefits such as a consistent supply and price stability, but under the rule of reason, such contracts are unlawful when "the 'probable effect' of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals." *Id.* at 403.

The Third Circuit reviewed its past decisions in *LePage's* and *ZF Meritor*. *Id.* at 404-07. The Circuit described its decision in *LePage's*, in light of *ZF Meritor*, as a matter in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, with the rebates conditioned on purchases across the multiple product lines. *Id.* at 405. The *Eisai* court found the decision in *LePage's* inapposite because nothing in the record indicated that "an equally efficient competitor was unable to compete" with the defendant. *Id.* at 406. The court in *Eisai* also distinguished *ZF Meritor* where noncompliance with the dominant manufacturer's agreements "would jeopardize the [customer's] relations with the dominant manufacturer" and potentially cut off the customer's supply. *Id.* By comparison, in *Eisai*, even if a GPO chose to terminate the defendant's agreement in its entirety, "it could still obtain Lovenox at the wholesale price," it would simply forgo the 1% discount. *Id.* The court in *Eisai* also explained that contracting with "a few dozen hospitals out of almost 6,000 in the United States is not enough to demonstrate 'substantial foreclosure'—particularly, if the reason a hospital did not

change to Fragmin was due to price, i.e., the loss of the discounts offered by the Program." *Id.* at 404. Finally, the *Eisai* court noted that the only example of an anticompetitive effect was a price increase in the defendant's drug, but the increase was consistent with the overall market. *Id.* at 407. Therefore, *Eisai* court upheld the district court's grant of summary judgment for the defendant. *Id.* at 408.

This Court makes a few observations in light of the foregoing cases. At the outset, neither bundled rebates nor exclusive dealing contracts are inherently anticompetitive. In fact, both can be procompetitive and potential anticompetitive effects are subject to a fact-sensitive analysis. One example of anticompetitive conduct, as discussed in *SmithKline*, occurs when a defendant offers a bundled rebate in which it links the competitive product with a product over which the defendant has a monopoly. Here, Plaintiff has not alleged that Defendants have a monopoly over the glaucoma drugs[14] which it bundles with Restasis, the product competing with Plaintiff's Xiidra. As a result, *SmithKline* does not support Plaintiff's position.

A second scenario was discussed in *Lepage's*, which offered a variation on *SmithKline*. In both cases, the defendant tied its bundled rebate to a product over which it had a monopoly. However, in *LePage's*, the defendant went further and linked its bundled rebate to several product lines. The plaintiff, however, did not have competing product lines with which it could link its private label transparent tape. Here, as noted, Plaintiff has not plausibly alleged that Defendants have a monopoly over their bundled glaucoma drugs. Moreover, Plaintiff – a large pharmaceutical company – has also not asserted that it did not have other available products that it could offer

---

[14] By monopoly, the Court means that Plaintiff has not alleged that Defendants' glaucoma drugs do not face competition from a comparable substitute.

Plan 1 or Plan 2 as part of a bundled rebate. *LePage's*, therefore, also does not support Plaintiff's position.

Additionally, Plaintiff does not find relief pursuant to *ZF Meritor*. *ZF Meritor* dealt with a highly concentrated market, HD transmissions, that had significant barriers to entry. Plaintiff has not made similar allegations concerning the pharmaceutical drug market in which it operates. Moreover, because the market in *ZF Meritor* was so highly-concentrated and because the defendant had been dominant in the market for decades, the OEMs had to have access to the defendant's products. No similar allegation has been made here as to Restasis; that is, Plaintiff has not asserted that either government or commercial payers must have Restasis (or other Defendant products).

More importantly, *ZF Meritor* involved contracts that were at least five years in length. The contracts at issue here are for one year and are open to competitive bidding on an annual basis. FAC ¶ 68. As the Third Circuit observed in *ZF Meritor*, short-term agreements present little threat to competition. *ZF Meritor*, 696 F.3d at 286 (citing cases where courts found that contracts under one-year in duration are presumptively lawful and contracts for one to two years are lawful). Plaintiff relies on an unnamed person from Plan 3 indicating, in response to Plaintiff's inquiry as to how to compete with Defendants moving forward, that "you don't." FAC ¶ 102. This statement supports Plaintiff's position, but it is not sufficient to carry Plaintiff's plausibility burden. Plaintiff does not indicate who within Plan 3 made the statement, so it is not clear that the speaker had authority to make such a broad pronouncement for Plan 3. Moreover, the statement can be interpreted as business posturing for future negotiations. Most importantly, the statement only pertains to Plan 3 – it fails to account for future dealings with Plans 1 and 2.

In sum, Plaintiff has not plausibly pled the requisite anticompetitive conduct. For this independent reason, the motion to dismiss is granted.

Tortious Interference

Defendants argue that because Plaintiff's tortious interference count is premised on the alleged anticompetitive conduct, and because the Plaintiff's anticompetitive conduct is not plausibly pled, the tortious interference count must also be dismissed. Def. Br. at 40. Plaintiff replies that tortious interference can encompass conduct broader than anticompetitive behavior; thus, its claim may stand even if the Court grants Defendants' motion to dismiss as to the antitrust allegations. Pl. Opp'n at 39-40.

Under New Jersey law, tortious interference has four elements: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739 (1989)). The Court agrees with Plaintiff that, as a matter of law, tortious interference can cover wrongful conduct other than antitrust activity. However, as pled, the only improper conduct on which Plaintiff bases its claim for tortious interference is Defendants' alleged anticompetitive activity. FAC ¶¶ 200-208. As a result, because the Court is dismissing Plaintiff's antitrust counts, it also dismisses Plaintiff's tortious interference count.

**V. CONCLUSION**

In sum, the Court grants Defendants' motion to dismiss Plaintiff's First Amended Complaint, D.E. 14. The Court dismisses all counts without prejudice. Plaintiff has thirty (30) days to file a second amended complaint, if it so chooses, consistent with this Opinion. If Plaintiff

fails to file a second amended complaint, the dismissal of Plaintiff's counts will be with prejudice.

An appropriate Order accompanies this Opinion.

Date: March 22, 2019

John Michael Vazquez, U.S.D.J.